IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

BARBARA ANN ROBERTS,               )
                                   )
        Plaintiff,                 )
                                   )       1:08CV1011(LMB/TRJ)
v.                                 )
                                   )
ERIC HOLDER, Attorney General      )
and                                )
DONNA CARR, (Acting) Chief Clerk,  )
                                   )
        Defendants.                )

MEMORANDUM OPINION

Before the Court are the defendants' Motion for Summary
Judgment and Motion to Dismiss as to Donna Carr.  For the reasons
discussed below these motions will be granted.

I.   PROCEDURAL BACKGROUND

Roberts originally filed this employment discrimination
action in the U.S. District Court for the District of Columbia,
where she was represented by counsel.  On the government's
motion, it was transferred to this Court.  Since transfer,
Roberts has proceeded pro se as her previous counsel is not
licensed in Virginia.  Roberts has alleged race-based
discrimination, hostile work environment, harassment, and
retaliation in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2000e et seq. ("Title VII").

Roberts has missed numerous deadlines and appearances.  She
failed to appear for the final pretrial conference and has failed

to file her exhibit and witness lists despite being ordered to do so by the Court.  She has also failed to file any responsive pleadings to the defendants' summary judgment motion other than a motion for "suspension of case," in which she asked the Court to suspend the case while she attempted to work out a "global settlement" of all of her claims against the Department of Justice.  The defendants opposed this motion, and the Court denied it.  Finally, Roberts failed to appear for the hearing on the defendants' summary judgment motion.

## II.   FACTUAL BACKGROUND

Plaintiff Barbara Roberts is an African-American woman who was employed until November 8, 2008[1] as a legal assistant by the U.S. Department of Justice, Executive Office of Immigration Review (EOIR), Board of Immigration Appeals (BIA).  She began her employment with the EOIR in August 1998, and moved to the Office of the Chief Clerk beginning in approximately 2000.

Karen Vowell, a Caucasian female and Roberts' main alleged antagonist, became her supervisor in 2002-2003.  After Vowell became her supervisor, Roberts alleges that Vowell and others

---

[1]When she filed her Complaint, Roberts was still employed by the EOIR.  According to the defendants' summary judgment memorandum, she was removed from her position on November 8, 2008.  She appealed her removal to the Merit Systems Protection Board.  This removal is not at issue here, as there is no evidence that Roberts has exhausted the administrative process. In addition, Roberts has not moved to amend her complaint to add a claim that her removal from the EOIR was an act of retaliation.

discriminated against her on the basis of race by targeting her for mistreatment, verbal abuse, and discipline.  Roberts focuses much of her case on various performance evaluations.

For the 2001-2002 year (ending March 31, 2002), Roberts received an overall "Fully Satisfactory" rating with an "Outstanding" rating in case/files management.  This review was not performed by Vowell.

Roberts' job performance in 2002-2003 was excellent.  In February, she broke the office record by producing 1,500 briefing schedules in one month, and subsequently broke her own record the next month by producing 2,500.  Roberts claims that based on her performance, new standards were issued for the office, which caused some resentment among other employees.

Notwithstanding the excellent job performance, Roberts came into repeated conflicts with other employees and individuals.  In June 2002, Roberts had a loud confrontation with Vessalina Bailey, an African-American contractor.  Roberts alleges that only she was punished, while Bailey was allowed to continue as a contractor.  Similarly, also in June, Roberts had a confrontation with Mildred Byers, an African-American employee. Roberts alleges that Byers was not sanctioned.

Roberts alleges that in October 2002, three employees, including Karen Vowell, her supervisor, erroneously blamed her for problems with invoices, causing Roberts to have a nervous

3

breakdown for which she took three months medical leave.   In
December, Vowell allegedly cursed at Roberts and called her
"selfish" because Roberts had taken the medical leave, causing
the performance of their "team," the Western Team, to suffer.

Notwithstanding the above incidents, Roberts received an
overall rating of "Outstanding" for the 2002-2003 year, with an
"Outstanding" rating in all job elements except
"Communications/Teamwork," where she was rated as "Fully
Successful."   This was Roberts' first review performed by Vowell.

During the 2003-2004 work year, Roberts' strong job
performance continued; on July 9, 2003, she received one of nine
"spot awards" in recognition of her performance.   However, issues
with other employees, and Vowell in particular, continued to be a
problem.   On April 7, 2003, after Roberts and a white employee,
Natalie Myers, showed up a few minutes late, together, Vowell
allegedly confronted only Roberts, and not Myers, and demanded
that only Roberts turn in leave slips.   Roberts also alleges that
on January 5, 2004 Vowell berated her, using profanity, at a
meeting in front of co-workers, saying that "everyone is tired of
hearing her s---, especially management, take your evaluation and
go look for another job."   On February 6, 2004, Roberts had
another confrontation with Byers; Vowell intervened and allegedly
took Byers' side.

On February 10, 2004, the incident that directly

4

precipitated Roberts' reassignment occurred.  Roberts alleges

that Vowell interrupted a conversation between Roberts and a co-

worker, Beverly Shears, berating her loudly and approaching her

closely with her "fist balled up."  Roberts alleges that she

reported this incident to her union, her second-line supervisor,

Frank Krider, and the office's Ombudsman, who recommended that

Roberts avail herself of a doctor at the agency's Employee

Assistance Program.  Roberts alleges that while she was on the

phone with the doctor, Vowell again verbally reprimanded her for

taking lunch beyond her authorized hours; Roberts alleges that

Krider had given her permission to do so.  After this incident,

Roberts was transferred from Vowell's team.  She was first moved

to another part of the same office for one week, and then

assigned on detail to another office, the Streamline Center, to

give her, as one supervisor put it, a "fresh start."

On February 23, 2004, soon after Roberts' arrival at her new

post, W. Wayne Stogner, Vowell's second-line supervisor at the

Streamline Center, told her that Vowell had informed him and

other supervisors of her "reputation,"[2] and that she would have

to work hard to change that reputation.  In his deposition,

Stogner said that he had been advised of Roberts' reputation, but

---

[2]According to Roberts, Stogner said that Vowell stated that
Roberts was often away from her desk, left work early without
permission, spoke with a "heavy" voice on the phone, and had
trouble getting along with co-workers.

viewed her as a "project" to improve.

Roberts' performance at the Streamline Center was well-received.  Pursuant to agency policies, Stogner and Roberts agreed that her appraisal period for 2003-2004 would be extended further into 2004 to allow her new supervisors at the Streamline Center to evaluate her.  Roberts also claims that Stogner promised that her Streamline Center supervisors would complete the evaluation without Vowell's input.  Ultimately, however, Vowell was consulted on the 2003-2004 evaluation.

Roberts received an overall "Outstanding" evaluation with an "Outstanding" rating for all categories except "Communications/Teamwork," where she was rated as "Fully Successful."  This was the same rating she received in 2002-2003.  The "Fully Successful" rating, according to Stogner, came largely from Vowell's input about Roberts' difficulties getting along with other employees.  According to Stogner, Vowell acknowledged that it was difficult to evaluate Roberts, because her work product was outstanding but she was so difficult in her interpersonal relations.  Roberts claims that as a result of this downgrade, she was ineligible to receive a QSI (quality step increase) in pay as well as an extra day off, and that her chances for a promotion were compromised.

According to the Complaint, it was at this point, after the 2003-2004 evaluation, that Roberts came to believe that she was

the subject of racial discrimination. She met with Equal
Employment Opportunity ("EEO") counsel to make an informal
complaint on July 20, 2004, and on August 12, 2004, EEO
representatives met with Roberts, Stogner, and Vowell together.
Roberts claims that at the meeting, Vowell admitted that she had
blamed Roberts for her confrontations with Byers because she and
Byers had a personal friendship, Byers came to her crying, and
Vowell wanted to protect Byers. Roberts also alleges that after
the August 12, 2004 meeting, all present agreed that her 2003-
2004 appraisal should be corrected, but it was never done as no
one would take responsibility. On August 19, 2004, Roberts filed
a formal claim of race-based discrimination with the EEO.

Roberts claims that after she filed her discrimination
claim, she was subjected to additional harassment, a hostile work
environment, and reprisal. She alleges that on two occasions in
September 2004, she returned to the Western Team office, once to
give out items that her former co-workers had ordered from her
children for a school fundraiser, and once to seek help from a
friend to fill out her "KSAs" (knowledge, skills, and abilities
forms) because she was applying for new jobs. She claims that on
the first occasion, Vowell was hostile towards her, and on the
second, two supervisors, Krider and Dorrence (Dee) Andrews,
emailed Stogner to complain that Roberts was visiting the Western
Team office. Roberts also alleges that on November 29, 2004,

7

Glenda Evans, her first-line supervisor at the Streamline Center, directed that Roberts' "time and attendance" reports, which were still being processed at her old job location because she was only on temporary detail, be sent through inter-office mail instead of having Roberts pick them up in person.  Roberts claimed that the extra time for inter-office mail made it impossible to correct any potential mistakes in her report before paychecks were issued.

In late 2004, Roberts' detail to the Streamline Center ended and she was returned to the Clerk's Office, although she now reported to a different supervisor.  Almost immediately, however, hostilities developed between Roberts and her co-workers and supervisors.  On December 20, 2004, after Roberts requested a file from Vowell via e-mail, Vowell responded that Roberts should go through her supervisor, not Vowell, because of "the horrible charges" that Roberts filed against Vowell.

On February 3, 2005, Roberts was assigned to the Priority Case Management Team within the Clerk's Office, under the supervision of Steve Gunderson, a Caucasian male, and Andrews, an African-American woman.  Roberts alleges that Andrews targeted her for harsh treatment, and did so in retaliation for Roberts' filing an EEO complaint.  On March 15, 2005 Andrews allegedly pointed a finger in Roberts' face after Andrews claimed Roberts was wasting time sending emails instead of working.  On March 15

8

and 16, Roberts claims she found copies of emails Andrews had sent her taped to her computer screen, which Roberts claims Andrews did with intent to embarrass her.  On March 17, Andrews allegedly sent Roberts a series of hostile emails berating her for spending time completing a computer security test (which Roberts claims was mandatory) before scanning documents.  For 2004-2005, Roberts received a performance evaluation rating her "Fully Satisfactory" overall and for each job element.

In 2005-2006, Roberts again came into conflict with co-workers.  On June 2, 2005, Roberts again had conflicts with Vessalina Bailey.  Roberts alleges that during their argument, Bailey threatened violence against her, and that a supervisor, Wanda Jones, wrote up a report without mentioning Bailey's threats.  As a result of this incident, the Chief Clerk, Donna Carr, suspended Roberts for one week on August 17, 2005.

In September, Andrews was replaced by John Seilers as Roberts' supervisor.  Roberts apparently got along well with Seilers, who provided positive evaluations of her work.  In December, Roberts was temporarily detailed to the Office of the General Counsel ("OGC"), where she also received positive evaluations.  Roberts claims that OGC wanted to retain her permanently, but the Clerk's Office did not agree to let her transfer, as they were short-staffed.

Despite Roberts' conflicts with employees and her

9

suspension, it appears that her solid job performance persuaded her supervisors to give her favorable performance ratings. For 2005-2006, Roberts received an overall rating of "Outstanding," as well as "Outstanding" in all areas, from the Clerk's Office. She received an overall rating of "Outstanding," and a combination of "Outstanding" and "Excellent" ratings, from OGC.

In September 2006, Roberts' detail to the OGC concluded and she was moved back to the Clerk's Office. At that point, she was given Federal Court Remand duties, a job that Roberts claims was originally assigned to a GS-12 employee and was then assigned to her, a GS-7 employee. Roberts claims that in retaliation for her previous EEO complaints, she was given this more difficult job to "sabotage" her so that her performance would decline, and that shortly after she took this job, her new supervisor, April Verner, began to write her up for purported mistakes.

On June 26, 2007, Roberts was suspended for seven days for failure to follow instructions and unprofessional conduct. The suspension stemmed from ten incidents in January and February of 2007 in which Roberts committed acts such as ignoring supervisors' instructions, acting belligerently and disrespectfully at meetings, and leaving meetings without permission or failing to provide an explanation.

For 2006-2007, Roberts' performance review, completed by Verner and Carr, was "Unsatisfactory" overall, with

10

"Unsatisfactory" ratings in all but one category
(Administration).

Roberts claims that as a result of the 2003-2004 and 2004-
2005 performance reviews, she was denied a QSI (quality step
increase) in salary. However, the defendants have produced
affidavits that no one in EOIR received QSIs during those time
periods because of budget constraints. However, one of the
affidavits - that of W. Wayne Stoger - asserts that these budget
constraints only occurred in 2004-2004, whereas in 2003-2004
Roberts' one non-outstanding rating did, in fact, cost her a QSI.
Roberts also claims that she was denied a pay increase on June
26, 2007, again because of her negative evaluations. This
assertion does not appear to be disputed.

### III. DISCUSSION

Summary judgment is appropriate when, on the basis of the
pleadings and attached evidence, there is no genuine issue of
material fact and the moving party is entitled to a judgment as a
matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986). Evidence must be viewed in
the light most favorable to the nonmoving party. Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
The non-movant must set forth specific facts showing that there
is a genuine issue for trial, and not rest on mere allegations.
Fed. R. Civ. P. 56(e). Evidence that is "merely colorable" or

"not significantly probative" is insufficient to overcome a
summary judgment motion.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477
U.S. 242, 249 (1986).  The nonmoving party must "go beyond the
pleadings and by her own affidavits, or by the depositions,
answers to interrogatories, and admissions on file, designate
specific facts showing that there is a genuine issue for trial."
<u>Celotex Corp.</u>, 477 U.S. at 317 (internal quotation marks
omitted).

Summary judgment will be granted to the defendants.  As a
preliminary matter, many courts within the Fourth Circuit, as
well as other circuits, have held that a plaintiff's failure to
respond to a summary judgment motion constitutes waiver or
abandonment of a claim.  <u>See</u>, <u>e.g.</u>, <u>Mentch v. Eastern Sav. Bank,
FSB</u>, 949 F.Supp. 1236, 1246-47 (D. Md. 1997).  In addition, under
Local Civil Rule 56(B), because Roberts has failed to provide a
response to the defendants' statement of material facts, the
Court may assume that all of them are true.

However, even if Roberts is given the benefit of the doubt
as a <u>pro se</u> plaintiff and the Court evaluates the government's
arguments on their merits, the defendants are still entitled to
summary judgment.  The government has provided a legitimate,
nondiscriminatory reason - Roberts' behavior - to explain why the
defendants took the personnel actions she alleges to have been
racially discriminatory, harassing, or retaliatory.  There is not

even a hint of any evidence of racially-motivated discrimination or harassment on the record; all the evidence shows that any negative treatment of Roberts, even if unwarranted, was not motivated by her race but by personal animus between Roberts and some of her supervisors.  Similarly, although there is temporal proximity between Roberts' EEO complaint and some of the conduct in question, the defendants has rebutted any inferences of retaliation by providing legitimate race-neutral and non-retaliatory explanations that are supported by the evidence in the record.  Because Roberts has failed to respond in any way to the defendants' motion, she cannot show that the these explanations are pretextual.  On this record, she cannot avoid summary judgment.

A. Discrimination.

Roberts claims that Vowell and others targeted her for adverse treatment because of her race.  Her complaint, which was drafted by counsel, lists numerous facts under the heading "DISCRIMINATION BASED ON RACE," Compl. ¶¶ 15-78; however, under the section "Count 1: Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.," Compl. ¶¶ 133-145, Roberts lists only one specific alleged violation: that Vowell's input in the 2003-2004 evaluation caused Roberts to be downgraded from "outstanding" to "fully successful" in the "communications/teamwork" category.  This, according to

13

Roberts, caused her to lose eligibility for her QSI bonus and diminished her "professional marketability."

To prevail on a Title VII claim of discrimination, a plaintiff must first establish a prima facie case of unlawful discrimination, or "prove a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that [an] adverse employment action was the product of discrimination." Ennis v. Nat'l Ass'n, 53 F.3d 55, 58 (4th Cir. 1995). If the plaintiff can do so, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the action in question. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). If the defendant meets this burden, the plaintiff must prove, by a preponderance of the evidence, that the defendant's reasons are merely pretextual. Id. To make out a prima facie case, the plaintiff must show that she is a member of a protected class, was qualified for her job and performed it satisfactorily, suffered an adverse employment action, and was treated differently than similarly situated employees outside the protected class. Autry v. N.C. Dep't of Human Res., 820 F.2d 1384, 1385 (4th Cir. 1987).

Roberts' discrimination claim fails because she cannot make a prima facie case of discrimination. Although she is a member of a protected class and performed her job, and even assuming

14

that she suffered adverse employment actions,[3] there is not a
scintilla of evidence that her less-than-stellar evaluation was
based on her race. The defendants have offered unrefuted
evidence that:

- Karen Vowell, Roberts' supervisor during the period in
  question, supervised a team of 9 employees, 8 of whom were
  African-American. Krider Aff. 4. Of the 8 African-American
  employees supervised by Vowell, 5 received Outstanding
  ratings in all performance elements, 2 received Outstanding
  ratings in 3 of the 4 elements, and 1 received Outstanding
  ratings in 2 of the 4 elements. Id.

- Throughout her tenure at EOIR, Roberts had numerous run-ins
  with supervisors and co-workers, including a white
  supervisor (Vowell), an African-American co-worker (Byers),
  an African-American supervisor (Andrews), and an African-
  American contractor (Bailey).

---

[3]To the extent that the only alleged adverse action in the
discrimination count a downgrade in one evaluation category in
one year (2003-2004), the defendants argue that it cannot
constitute an adverse employment action. The Fourth Circuit has
held that a downgrade in a performance evaluation is only
actionable if the employer subsequently used it as a basis to
detrimentally alter the terms or conditions of the employee's
employment. James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371,
377 (4th Cir. 2004). As described above, there is a dispute
between the parties as to whether the downgrade in ratings cost
Roberts a QSI in salary in 2003-2004 because the defendants have
provided some evidence that no EOIR employees received QSIs that
year because of budget constraints. In any case, even assuming
that the downgrade did cost Roberts a QSI, Roberts cannot show
that the downgrade was based on her race.

- Byers, the principal employee who, according to Roberts, was treated more favorably than Roberts, was African-American.
- Roberts developed a "reputation" that was known to supervisors outside her own working team.

Even if Roberts were targeted by Vowell, Andrews, and others for harsh treatment, there no evidence whatsoever to even suggest that such targeting was related to Roberts' race. Rather, the evidence is that Vowell and Roberts did not get along - and indeed, that Roberts did not get along with numerous people, many of whom were African-American. Accordingly, this claim fails.

B. Hostile Work Environment and Retaliation.

Roberts further alleges that she was subjected to harassment, a hostile work environment, and retaliation after she filed her EEO complaint on August 19, 2004.

Once again, the Complaint includes numerous events under the catch-all heading "RACE DISCRIMINATION AND REPRISAL DISCRIMINATION CONSTITUTING HARASSMENT AND CREATING A HOSTILE WORK ENVIRONMENT." However, in the "Claims for Relief" section, Roberts isolates the following events: (1) Vowell's preventing Roberts from visiting the Western Team office to inspect and sign her time and attendance report, instead insisting that the report be sent by inter-office mail, (2) the downgrading of Roberts' mid-term performance evaluation in 2004-2005 from "outstanding"

16

to "fully satisfactory," (3) Vowell's one-time refusal to send Roberts a document "due to the horrible charges" Roberts had filed, (4) Evans' ordering Roberts not to go to the Western Team office to socialize with her friends and former co-workers, (5) the "sabotaging" of Roberts by putting her in a job for which she was not qualified and doomed to fail, and (6) Carr's using Roberts' failures at the new job as a pretext to impose a one-week suspension. She also alleges that her various supervisors generally "harassed and/or acquiesced in allowing the harassment."

Roberts' claims for harassment and hostile work environment discrimination fail for the same reason her discrimination claim fails: there is no evidence whatsoever that, to the extent she was treated harshly, such treatment was in any way related to her race. To make a prima facie claim for a hostile work environment, a plaintiff must show (1) unwelcome conduct or harassment (2) based on race, gender, or other protected characteristic (3) sufficiently severe and pervasive so as to alter the conditions of employment and create a hostile work environment, and (4) some basis for imputing liability to the employer. Smith v. First Union Nat'l Bank, 202 F.3d 234, 241 (4th Cir. 2000). Assuming that Roberts could satisfy the other three elements, there is no indication whatsoever that any of the allegedly hostile conduct Roberts faced was based on her race.

17

There is no evidence of racial animus by any of Roberts'
supervisors. In her complaint, Roberts has pointed to isolated
incidents where she was treated differently and disciplined more
harshly than other individuals with whom she had conflicts;
however, at least two of those employees - Byers and Bailey -
were themselves African-American. Indeed, one of Roberts'
harshest supervisors who allegedly created a hostile work
environment, Andrews, was also African-American. Lastly, Roberts
has provided absolutely no evidence to support the allegations in
her complaint or to refute the defendants' evidence. In light of
this record, Roberts cannot even make a prima facie case for
hostile work environment or harassment; therefore, these claims
fail.

Roberts' retaliation claim requires slightly more inquiry,
as retaliation under Title VII need not be directly based on race
or a protected characteristic; rather, to prevail on a
retaliation claim, Roberts must prove that she took a protected
action, and that her employer took a materially adverse action
against her that was causally connected to the protected action.
Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir.
2007). The standard for a "materially adverse" action is one
that might "dissuade[] a reasonable worker from making or
supporting a charge of discrimination." Burlington Northern &
Santa Fe Rwy. Co. v. White, 126 S. Ct. 2405, 2415 (2006).

Roberts clearly took a protected action under Title VII when she filed her EEO complaint on August 19, 2004. Because some of the incidents described above occurred in close temporal proximity to the EEO complaint, this raises the possibility that the actions were retaliatory; thus, it is necessary to examine this claim closely.

Many of the actions Roberts claims were retaliatory cannot be considered "materially adverse" under the <u>Burlington Northern</u> standard. Specifically, requesting that a worker not spend time socializing in her former work space, particularly when that worker had a history of conflicts with her co-workers and supervisors, is not materially adverse. Similarly, sending a time and attendance report via inter-office mail, rather than allowing the employee to pick it up in person, is also not materially adverse, nor is the one-time failure by Vowell to send Roberts a document that Roberts was able to obtain from her new supervisor.

As for the other alleged actions - downgrading Roberts' evaluation, placing her into a job intending her to fail, and suspending her for one week without pay - although these actions might be considered materially adverse, Roberts has presented no evidence other than mere speculation that they were retaliatory, and the facts in evidence strongly suggest otherwise.

Roberts' evaluation in 2004-2005 was indeed one of her more

19

negative evaluations; she received "fully successful" ratings in all categories and no "outstanding" ratings. However, the comments on her evaluation articulate legitimate, non-retaliatory reasons for the ratings, noting that Roberts "was given guidance that was designed to improve her performance" (a comment that gives rise to an inference that her performance had been lacking), "has had difficulty in adapting to the new FOIA procedures," "has failed to perform [scanning of cabinets] without a direct order being given and even then, she failed to begin the assignment at the specified time." Moreover, Roberts' Complaint notes that she had a number of conflicts with Andrews during 2004-2005. On the record before the Court, the defendants have met their burden of articulating why Roberts' performance evaluation for that time period was not retaliatory. Roberts' failure to file a response to the defendants' Motion for Summary Judgment means there is no evidence to suggest that these reasons are pretextual.

There is likewise no evidence from which a reasonable jury could conclude that Roberts was given the purportedly difficult job of Federal Court Remand duties to "sabotage" her and cause her to fail in retaliation for her EEO complaints. According to the evidence, Roberts was placed in this new position in late 2006, over two years after she filed her EEO complaint - a period far too long, without further evidence, to support the causation

element necessary for a claim retaliation claim.  See <u>Dowe v.</u>
<u>Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 657
(4th Cir. 1998) (holding that a three-year delay between
protected activity and adverse action was too long to support
causation).  Moreover, the unrefuted evidence from Roberts' 2006-
2007 evaluation is that Roberts received seven weeks of training
to prepare her for the new position, and according to the
evaluation, "the tasks involved in processing [remands were] not
new to her."  Roberts has made no showing, other than what she
alleges in her Complaint, that the new tasks she was assigned
were substantially different from those she had previously
performed, and there is certainly no evidence that would allow a
jury to conclude that the motivating factor behind the shift of
responsibilities was an insidious conspiracy to cause Roberts to
fail in retaliation for her two-year-old EEO complaints.

Finally, Roberts claims that her suspension in 2007 was
retaliatory.  Again, this suspension occurred over two years
after she filed her EEO complaint and therefore is not
actionable, without more evidence, as a retaliation claim.
Furthermore, the defendants have presented unrefuted evidence -
in the form of the suspension letter written by Carr - detailing
Roberts' conduct that led to her suspension, such as repeated
failure to follow instructions, argumentative behavior, and
mumbling under her breath when talking to supervisors.  In the

21

absence of any responsive brief or evidence by Roberts, there is absolutely no basis for holding that these reasons are pretextual.[4]

C. Additional Arguments Raised by Defendants.

The defendants have presented additional legal arguments regarding why Roberts' claims must fail.  They correctly argue that defendant Donna Carr should be dismissed because there can be only one defendant in a Title VII action arising in the federal workplace.  See Lassiter v. Reno, 885 F. Supp. 869, 873 (E.D. Va. 1995), aff'd, 86 F.3d 1151 (4th Cir. 1996). Accordingly, the defendants' motion to dismiss Carr will be granted.  The defendants also argue that three of the actions about which Roberts complains (her suspension, the 2004-2005 performance evaluation, and the denial of a step increase in June 2007) cannot be pursued in this Court as she has already elected to grieve those actions through her union under its collective bargaining agreement.  See Smith v. Jackson, 539 F.Supp.2d 116 (D.D.C. 2008).  Because the reasons articulated supra provide sufficient grounds for granting the defendants' Motion for Summary Judgment, the Court need not reach this issue.

---

[4]It is particularly noteworthy that in the suspension letter, Carr actually found in favor of Roberts on some of the incidents listed by Verner in her proposed suspension letter, and that Carr's ultimate suspension of 7 days was less than the 10-day suspension Verner had proposed.

22

IV.  <u>CONCLUSION</u>

For the above-stated reasons, the defendants' Motion for Summary Judgment and Motion to Dismiss will be granted by an Order to be issued with this Memorandum Opinion.

Entered this _13<u>th</u>_ day of March, 2009.

_____ /s/

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

23